**In re the Matter of the Purchase of the SUNTIDE INN MOTEL, OKLAHOMA CITY, Oklahoma, by the State of Oklahoma acting through the State Board of Affairs on behalf of the Oklahoma Department of Corrections.**

No. 50588.

Supreme Court of Oklahoma.

April 5, 1977.

Rehearing Denied May 9, 1977.

**5.** *Levi v. Special Indemnity Fund,* 389 P.2d 620 (Okl.1964).

**6.** *Special Indemnity Fund v. Hulse,* 441 P.2d 366 (Okl.1968).

Larry Derryberry, Atty. Gen. of Oklahoma, Paul Crowe, James H. Gray, R. Thomas Lay, Asst. Attys. Gen., Oklahoma City, for petitioners.

Walter M. Powell, Municipal Counselor, John M. Williams, Asst. Municipal Counselor, Oklahoma City, for City of Oklahoma City.

BARNES, Justice:

The Oklahoma Department of Corrections was authorized by House Bill No. 2006,[1] Second Session, Thirty-fifth Oklahoma Legislature, to acquire and build two or more community treatment center facilities within the State. In addition, the same session of the Legislature enacted House Bill No. 1737 [2] appropriating certain monies to the State Board of Public Affairs and

---

1. The pertinent portions of House Bill No. 2006 provide as follows:

"SECTION 1. *Appropriation*

"There is hereby appropriated to the Department of Corrections, from any monies in the General Revenue Fund of the State Treasury, for the fiscal year ending June 30, 1975, not otherwise appropriated, the following amount, or so much thereof as may be required for the purposes specified:

"DEPARTMENT OF CORRECTIONS

". . .

"Purchase or construction of two or more community treatment center facilities 600,000.00

. . ."

2. House Bill No. 1737, appropriating certain monies to the State Board of Public Affairs, provides in Section 11:

"SECTION 11. *Land acquisition*

"The State Board of Public Affairs, subject to the approval of the State Board of Corrections, shall acquire for the Department of Corrections the necessary lands for the facilities authorized in House Bill No. 2006, Thirty-fifth Oklahoma Legislature, Second Regular Session."

authorizing the acquisition of the necessary land to construct the facilities authorized in House Bill No. 2006. Pursuant to that legislative authority, the Department of Corrections began an extensive site selection process.

On December 17, 1976, the State Board of Public Affairs entered into a contract with Suntide Inn Operating Corporation (seller) for acquisition by the Board of Corrections of the Suntide Inn Motel property, located at Northwest 39th Street Expressway and Interstate 240 in Oklahoma City, as the site of one of the facilities.

Thereafter, the City of Oklahoma City informed the State and its agencies that should the State attempt to use the property as a community treatment facility, without submitting the proposed site to the Oklahoma City Planning Commission for approval pursuant to 11 O.S.1971, § 1420, the City would institute proceedings to enjoin such use. For this reason the Board of Corrections and the Board of Affairs (Petitioners), as agencies of the State, brought this original proceeding by and through Larry Derryberry, Attorney General of Oklahoma, asking this Court to assume original jurisdiction pursuant to Article VII, § 4, Oklahoma Constitution, and seeking a judicial determination of the legal question presented.

In view of the public importance of this matter and the need for an early decision, we have decided to assume original jurisdiction. *Morrison v. Ardmore Industrial Development Corp.,* 444 P.2d 816 (Okl.1968); *Application of County Courthouse Building Commission,* 403 P.2d 501 (Okl.1965).

■ As a general rule a State governmental body is not subject to local zoning regulations or restrictions. *Rutgers, State University v. Piluso,* 60 N.J. 142, 286 A.2d 697 (1971); *Nowack v. Department of Audit and Control,% 72 Misc.2d 518, 338 N.Y.S.2d 52 (1973).*

*Nowack, supra,* involved an action for a declaratory judgment and injunctive relief, in which plaintiffs sought an order restraining the Division of Youth, Executive Department of the State of New York, from purchasing premises within the city known as 50 Browncroft Boulevard for a youth center to house, under adult supervision, some three to seven youths, who needed help for corrective or rehabilitative purposes. The property was situated in an R-1 residential district under the city zoning ordinance in which the proposed use was not permitted. The State had not made, nor did it intend to make, any application to the city zoning authorities for approval of the use. The Court said therein:

"The crux of the complaint is that the contemplated use violates the building and zoning ordinances of the city and that without proper zoning approval the acquisition of the property by the state for the contemplated use is illegal and void. In creating the Division for Youth the legislature directed that, as one of its functions, youth centers be established, operated and maintained in order to prevent youth delinquency and youth crime. (Executive Law, § 501). It appears that this property is being acquired to carry out such purpose. The Rochester Zoning Ordinance would have the effect of 'thwarting the state's policy' as expressed in the Executive Law of providing for youth centers to prevent delinquency and crime and 'insofar as it conflicts and hinders an overriding State Law and policy * * * (it) is void * * *.' (cases cited). The Division for Youth is entitled to an exemption from the zoning ordinances of the City of Rochester to operate a youth center and is not required to obtain zoning approval or other consents."

In *Rutgers, supra,* it was held that Rutgers University was an instrumentality of the State and, as such, immune from local zoning ordinances in its choice of site for housing facilities for students. The Court therein stated in *Rutgers, supra* :

"With regard to a state university (passing for the moment the matter of any peculiar status of Rutgers), there can be little doubt that, as an instrumentality of the state performing an essential governmental function for the benefit of all

the people of the state, the Legislature would not intend that its growth and development should be subject to restriction or control by local land use regulation. Indeed, such will generally be true in the case of all state functions and agencies."

See also *Bloomfield v. New Jersey Highway Authority,* 18 N.J. 237, 113 A.2d 658 (1955), in which the New Jersey Supreme Court concluded that an instrumentality of the State, such as the Highway Authority, should be immune from local zoning ordinances if the following criteria are met:

1. The project is a State project for a public use;
2. The public purpose is an essential governmental function;
3. The public need for such a project is urgent;
4. The public goal could be completely thwarted by the intervention of local communities; and
5. The history or statute is devoid of any indication of legislative intent or purpose that such an important State wide facility should be so restricted.

In the instant case the final rehabilitation of prisoners at a community treatment center prior to release to society is a public concern and is an essential governmental function necessary for the welfare of the State and its people. We think it is obvious that the legislative goal as provided in House Bill No. 1737 and House Bill No. 2006 would be thwarted if the City Planning

Commission was permitted to negate the planned location of the center.

 Here, Oklahoma City does not question the general rule of State immunity, but contends that 11 O.S.1971, § 1420 [3] specifically requires the State to submit its proposed site within their city limits to the City's Planning Commission for its approval or rejection. We do not agree. Such an intention is not plainly expressed or clearly implied in reading § 1420, supra. See *Davidson County v. Harmon,* 200 Tenn. 575, 292 S.W.2d 777 (1956), where the Tennessee Supreme Court stated:

"The sovereign (State of Tennessee) is not bound by a statute unless it be expressly stated in the statute that the sovereign is to be bound. . . . This rule is recognized as far back in this state, as *State v. Crutcher's Adm'r.,* 32 Tenn. 504, at page 509, where the Court there quoted from Mr. Justice Story to this effect:

" 'Where the government is not expressly, or by necessary implication, included, it ought to be clear, from the nature of the mischief to be redressed, or the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorized to put an interpretation upon the statute.' "

The Tennessee Court went on to quote from a Pennsylvania case, *Jones v. Tatham,* 20 Pa. 398, in part as follows:

" 'The general business of the legislative power is to establish laws for individ-

---

3. 11 O.S.1971, § 1420, provides:

"Whenever the commission shall have adopted the master plan of the municipality or of one or more major sections or districts thereof, no street, square, park, or other public way, ground, or open space, or public building· or structure, or other government enterprise, shall be constructed or authorized in the municipality or in such planned section and district until the location, character and extent thereof shall have been submitted to and approved by the commission: Provided; That in case of disapproval the commission shall communicate its reasons to council, which shall have the power to overrule such disapproval by a recorded vote of not less than two-thirds (⅔) of its entire membership: Provided, however, That if the public way, ground, space, building, structure,

or other governmental enterprise, be one the authorization or financing of which does not, under the law or charter provisions governing same, fall within the province of the municipal council, the submission to the planning commission shall be by the board, commission, or body having such jurisdiction, and the planning commission's disapproval may be overruled by said board, commission, or body by a vote of not less than two-thirds (⅔) of its membership. And provided further, that if the sponsoring agency is appointive and not elected, the disapproval of the commission cannot be overridden except by a vote of not less than two-thirds (⅔) of the City Council. The failure of the commission to act within sixty (60) days from and after the date of official submission to the commission shall be deemed approval."

uals, not for the sovereign; and, when the rights of the commonwealth are to be transferred or affected, the intention must be plainly expressed or necessarily implied.' "

The language of § 1420, supra, does not specifically refer to "state", public building, structure, or other governmental enterprise; neither does the language providing for overriding the Planning Commission's disapproval specifically or impliedly refer to the "state".

Furthermore, even if § 1420, supra, was found expressly or by implication to restrict the sovereign State by subjecting it to municipal control, the Petitioners would still not be bound in this case because House Bill No. 1737 and House Bill No. 2006 were passed in 1976, subsequent to the City Planning Acts of 11 O.S.1971, §§ 1411–1436. Being last in point of time, the latter Act repeals the former to the extent of its inconsistency, the same being the last expression of legislative intent. *Ramsey v. Leeper,* 168 Okl. 43, 31 P.2d 852 (1933); *Brown v. Marker,* 410 P.2d 61 (Okl.1965).

Moreover, these bills are specific, and the rule is that specific legislation prevails over general legislation in case of conflict. *Beidleman v. Belford,* 525 P.2d 649 (Okl.1974); *Parks v. Stith,* 204 Okl. 625, 232 P.2d 614 (1951). Section 11 of House Bill No. 1737 specifically directed the State Board of Affairs, subject to the approval of the State Board of Corrections, to acquire for the State Board of Corrections the necessary lands for the facilities authorized in House Bill No. 2006. It is to be noted that there was no mention subjecting the choice to the approval of the City Planning Commission.

For the aforesaid reasons, this Court assumes original jurisdiction in this matter and concludes that 11 O.S.1971, § 1420, does not require the State of Oklahoma to submit its selection of a site for a community treatment center for approval of the Oklahoma City Planning Commission.

ORIGINAL JURISDICTION ASSUMED.

WILLIAMS and IRWIN, JJ., concur.

DAVISON and DOOLIN, JJ., concur specially.

HODGES, C. J., LAVENDER, V. C. J., and BERRY and SIMMS, JJ., dissent.

DOOLIN, Justice, specially concurring.

I agree with the majority, a task such as this regarding rehabilitation of prisoners, is a governmental function of such import and public concern as to preclude interference by a City Planning Commission.

However, I cannot subscribe to the view embraced by the majority in its adoption of the holding of *Davidson County v. Harmon,* 200 Tenn. 575, 292 S.W.2d 777 (1956) that the State of Tennessee is not bound by its statutes unless expressly provided otherwise. I believe the dissent correctly reflects a more enlightened view of the concept of sovereign immunity. To hold a state is never subject to local zoning restrictions is to emasculate in perpetuum, the very power the state has granted to municipalities, to zone and regulate its orderly growth.

The two authorities cited by the majority and the dissent, *Rutgers State University v. Piluso,* 60 N.J. 142, 286 A.2d 697 (1971); *Bloomfield v. New Jersey Highway Authority,* 18 N.J. 237, 113 A.2d 658 (1955) set forth certain criteria or standards for the balancing of interests of the governmental body seeking immunity against the welfare of the municipality. Apparently the majority has "balanced the interests" and finds the state's interests and immunities are paramount in these particular circumstances. I agree. A city's control of land-use planning must give way to effectuating this legislative goal. In an affective issue such as the location of a pre-release center, to hold otherwise could lead to a substitution of the city's collective emotionally tainted judgment for that of the wisdom of the Legislature.

I am authorized to state that Justice DAVISON concurs in the views herein expressed.

SIMMS, Justice, dissenting:

I respectfully dissent.

The majority's analysis of the applicability of 11 O.S.1971, § 1420 to the Board of Corrections is based upon the premise that the state is immune from municipal zoning regulations. It is from that starting point that the majority reaches its conclusion that the Board is not subject to § 1420 because "the state" is not specifically mentioned, and the presumption of immunity is therefore not overcome.

I take issue with the validity of the premise that the state has unqualified immunity from zoning regulations. Further, I believe that § 1420 does require the Board to submit its proposed site to the Planning Commission.

The extent to which the use of land by a superior governmental unit is subject to zoning regulations of the host government is before us for the first time. The traditional concept of immunity, which the majority adopts as the resolution of this conflict, is being discarded by other jurisdictions as too simplistic and is being replaced by a "balancing of interests" test. *Rutgers, State University v. Piluso,* 60 N.J. 142, 286 A.2d 697 (1972); *Long Branch Div. of United Civic & Tax Org. v. Cowan,* 119 N.J.Super. 306, 291 A.2d 381 (1972); *Town of Oronoco v. City of Rochester,* 293 Minn. 468, 197 N.W.2d 426 (1972); *City of Newark v. University of Delaware, Del. Ch.,* 304 A.2d 347 (1973); *Hillsborough Ass'n for Retarded Citizens, Inc., v. City of Temple Terrace, Fla.,* 332 So.2d 610 (1976). A comprehensive discussion is found in Note, "Governmental Immunity from Local Zoning Ordinances," 84 Harv.L.Rev. 869 (1971).

Contrary to the majority's statements, *Rutgers, State University v. Piluso, supra,* does not support their adoption of the state immunity concept. *Rutgers* is the leading case rejecting an automatic finding of immunity and adopting instead the more realistic balancing of interest approach.

The Court observed that:

"The question of what governmental units or instrumentalities are immune from municipal land use regulations, and to what extent, is not one properly susceptible of absolute or ritualistic answer. Courts have, however, frequently resolved such conflicts in perhaps too simplistic terms and by the use of labels rather than through reasoned adjudication of the critical question of which governmental interest should prevail in the particular relationship or factual situation."

The Court then advanced the following balance of interests test as a means to determine the existence and scope of immunity.

"The rationale which runs through our cases and which we are convinced should furnish the true test of immunity in the first instance, albeit a somewhat nebulous one, is the legislative intent in this regard with respect to the particular agency or function involved. That intent, rarely specifically expressed, is to be divined from a consideration of many factors, with a value judgment reached on an overall evaluation. All possible factors cannot be abstractly catalogued. The most obvious and common ones include the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests. . . . In some instances one factor will be more influential than another or may be so significant as to completely overshadow all others. No one, such as the granting or withholding of the power of eminent domain, is to be thought of as ritualistically required or controlling. And there will undoubtedly be cases, as there have been in the past, where the broader public interest is so important that immunity must be granted even though the local interests may be great. The point is that there is no precise formula or set of criteria which will determine every case mechanically and automatically."

It was under this balancing test that the Court determined that the history of, and statutory enactments regarding Rutgers did show a legislative intent to confer immunity from the townships zoning restrictions.

The Court held, however, that such immunity was not absolute, stating that:

"It is, however, most important to stress that such immunity in any situation is not completely unbridled. Even where it is found to exist, it must not, * * * be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. This rule must apply to the state and its instrumentalities as well as to lesser governmental entities entitled to immunity. For example, it would be arbitrary, if the state proposed to erect an office building in the crowded business district of a city where provision for off-street parking was required, for the state not to make some reasonable provision in that respect. And, at the very least, even if the proposed action of the immune governmental instrumentality does not reach the unreasonable stage for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible."

The Court then found that Rutgers' proposed use of the land for student housing, which had been presented to township authorities by a variance application, was not unreasonable.

Obviously, the majority makes no attempt to implement the criteria set forth in *Rutgers, supra.* The Board here is automatically declared immune by virtue of the state's superior position in the governmental hierarchy, and no opportunity will be afforded for determination of whether the Board has acted unreasonably and arbitrarily in its site selection.

I believe it is important to understand that this conflict is not simply between a city and a state agency attempting to exercise a sovereign power. The Legislature has specifically empowered cities to enact and enforce zoning regulations. 11 O.S. 1971, § 401, et seq., *Oklahoma City v. Barclay, Okl.,* 359 P.2d 237 (1961). Municipal zoning ordinances enacted pursuant to this statutory authority have the force of legislative enactments. *Weaver v. Bishop,* 174 Okl. 492, 52 P.2d 853 (1935). This zoning power is also a sovereign power, and in their exercise thereof, cities are "equally agents of the state." *Note,* 84 Harv.L.Rev. 869, 877. *See, City of Pittsburgh v. Commonwealth, Pa.,* 360 A.2d 607 (1976). The Legislature has enabled municipalities to comprehensively plan for, and enforce, their zoning policies through city planning commissions. 11 O.S.1971, § 1411, et seq.

The passage of the City Planning Commission Act shows the Legislature's awareness of the importance of intelligent land-use planning. Available land is a finite resource and the potential demands which may be placed upon it are infinite. Through the creation of City Planning Commissions, the Legislature gave municipalities a means by which they may attempt to control and direct future growth and land-use in a manner best suited to promote the "health, safety, morals, order, convenience [and] prosperity" of their present and future citizens, through "healthful and convenient distribution of population . . . good civic design and arrangement, and wise and efficient expenditure of public funds." 11 O.S.1971, § 1418.

I believe that the legislative intent of § 1420 is clearly to subject the state and its subdivisions to municipal zoning regulations and procedures. "[N]o street, square, park, or other public way, ground, or open space, or *public building or structure, or other government enterprise,* shall be constructed or authorized . . . until the location, character and extent thereof shall have been submitted to and approved by the commission."

I can find nothing in the appropriation bills, H.B. 1737 and 2006, which show an intent to exempt the Board from municipal zoning regulations nor a mandate for any

specific site selection. There are no provisions in the Bills which are inconsistent with § 1420, therefore the rules of statutory construction cited by the majority have no application.

I advocate adoption of the balancing of interest test and would do so even in the absence of § 1420. I believe it offers the only reasonable solution to this controversy and to similar controversies which are bound to arise.

There were, at last official count,[1] 235 state boards, agencies and commissions. It is unrealistic to assume that all "state" demands upon municipal land which these agencies could potentially make, would be for equally important public purposes or that their site selections would always be reasonable.

Each intergovernmental conflict over land-use will present novel questions regarding the relative interests of the governmental units involved, the reasonableness of the site location, the availability of alternative locations and the adverse consequences which will be suffered by local interests and must be resolved on a case by case basis.

I respectfully suggest that the Board should be required to submit its proposed site to the City Planning Commission for approval, as set forth by § 1420. Appeal may then be had to the City Council (§ 1420) and from there to the District Court (§ 1434). This statutory scheme insures due process of law by providing that all parties have an opportunity to be heard at a meaningful stage in the proceedings.

I am authorized to state that Chief Justice HODGES, Vice Chief Justice LAVENDER, and Justice BERRY concur in the views expressed in this Dissent.

1. A Compendium, Boards, Agencies and Commissions in the Executive Branch of the Oklahoma State Government, Prepared by the Oklahoma Legislative Council, 1975.